| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF GREENWOOD | |
| Angela Burris Priest<br>Plaintiff, | COMPLAINT<br>(JURY TRIAL DEMANDED) |
| vs. | |
| The City of Abbeville, the City of Abbeville Police Department, and Neil Henderson, in his Capacity as Chief of Police and David McCuen, individual.<br>Defendants. | C.A. No. 2015-CP- 01-150 |

FILED
STATE OF SOUTH CAROLINA
COUNTY OF ABBEVILLE
2015 MAY 22 PM 1 21
EMILY Y MCMAHAN
CLERK OF COURT

Plaintiff, complaining of Defendants, respectfully shows unto the Court as follows:

**JURISDICTION AND VENUE**

1. Plaintiff, Angela Burris Priest, ("Plaintiff") is a citizen and resident of Abbeville, South Carolina in the County of Greenwood.

2. Defendant, the City of Abbeville, (the "City") is a municipal corporation organized under the laws of the state of South Carolina with its office, agents and employees in Abbeville, South Carolina in the county of Greenwood.

3. Defendant, Abbeville City Police Department ("Department"), is operated for the protection of the Abbeville residents. It is under the direct control of the Chief of Police who reports to the City Manager, who is charged with oversight of the Department pursuant to the City's Code of Ordinances. (*See* City of Abbeville Code of Ordinances Sections 15-1 and 15-2).

4. The Department was under the supervision of Defendant Neil Henderson ("Henderson"), former Chief of Police for the Department, at all times up leading up to Plaintiff's claims that are the basis for this action. Henderson acted as chief executive officer of the Department. in supervising all Abbeville City police officers, including the Plaintiff, for all times related to Plaintiff's claims. (*See* City of Abbeville Code of Ordinances Section 15-2). Henderson was

TRUE COPY
5-22-15
BY Emily Y. McMahan
ABBEVILLE COUNTY CLERK OF COURT

an employee and/or agent for the Department at all times relevant to Plaintiff's initial claims as alleged herein. Further, upon information and belief, Henderson is a resident of Abbeville, South Carolina in Greenwood County and resided in Greenwood County at all times relevant to this action.

5.  Defendant David McCuen ("McCuen") is currently and was at all times relevant to this action City Manager for the City. As such, he appoints and supervises the Chief of Police in all of his duties pursuant to the City of Abbeville Code of Ordinances, as well as pursuant to the City's and the Department's official Policies and Procedures. McCuen supervised Henderson during his employment as Chief of Police for the Department, appointed the interim Chief of Police after Henderson's resignation, and appointed the current Chief of Police for the Department. Upon information and belief, McCuen operated at all times relevant to this action from his office located in Abbeville, South Carolina in Greenwood County. Further, upon information and belief, he resides in Abbeville, South Carolina in Greenwood County.

6.  Based upon the facts above, this matter is properly before this Court as to the City, the Department, Henderson and McCuen (hereinafter collectively referred to as "Defendants").

**FACTS**

7.  Plaintiff has been employed by the Department for over twenty (20) years. Her employment began in 1993 when she was hired as a reserve dispatcher. Plaintiff was thereafter promoted to Abbeville City Clerk of Court, Class III Officer.

8.  Since first being employed by the Department in 1993, Plaintiff dreamed of attending the Police Academy. Plaintiff accomplished that goal when she completed her training and graduated from the Police Academy in 2008. Plaintiff currently holds the title of Sergeant with the Department.

9.  Plaintiff was subjected to inappropriate conduct by her supervisor, Henderson, from the time he was named Chief of Police for the Department on March 9, 2004. However, Henderson's conduct became increasingly worse and far more malicious toward Plaintiff in 2009. During

the next four (4) years, Henderson sexually harassed Plaintiff, unfairly targeted her, treated her differently than other officers, intruded in her personal life, discriminated against her on a regular basis, intimidated her and caused her to live in constant fear for her job and her livelihood.

10. Upon information and belief, Henderson actions escalated in intensity and destructiveness in 2009, because he was enraged that Plaintiff began dating. For the previous years that Henderson had been Department "CEO" and, as such, Plaintiff's supervisor, Plaintiff was married. However, in 2009 Plaintiff was divorced. While Plaintiff was married, Henderson made inappropriate comments and demonstrated a "special interest" in her. However, after her divorce when Plaintiff started dating, Henderson began a targeted campaign to control Plaintiff's personal life through harassment, threats and intimidation.

11. While Plaintiff had been forced to endure sexual harassment by Henderson for years prior because she did not want to lose her job, when his behavior became increasingly hostile, intrusive and threatening, she had no choice but to report it.

12. In early 2009, Plaintiff was dating an individual who she learned had been involved in an incident with the Department. The incident was in no way connected to Plaintiff; she had no involvement in it; and Plaintiff never discussed the incident with the individual she was dating or with anyone outside of the Department. Plaintiff later learned that the matter was resolved and the case involving the individual she was dating was dismissed.

13. Months later, Henderson expressed to Plaintiff that it was inappropriate for Plaintiff to continue to see this individual. In fact, Henderson sent Plaintiff a text message stating that he knew she was dating this individual and threatening Plaintiff that he was going to "get SLED involved and have Plaintiff charged with misconduct in office". Plaintiff did not understand why Henderson would threaten her with a SLED investigation as she had never been involved in any conduct or any relationship that negatively impacted her ability to perform her job at the highest level of excellence or that violated her duties and obligations to the

Department. Plaintiff continued to stress to Henderson that she did not understand why he was he was threatening her in text messages containing threats and demands when she had not done anything that violated her duties as an employee of the Department. Plaintiff reasonably concluded that Henderson was using the threat of a SLED investigation to scare her, to intimidate her and to force her to submit to his control of her personal life.

14.    Plaintiff discussed Henderson's conduct with her supervisor at the time, Sargent Mike Eaton ("Sgt. Eaton"), on numerous occasions. Sgt. Eaton advised Plaintiff to contact Abbeville "City Hall" regarding Henderson's behavior, as the City, and specifically, the office of the City Manager, McCuen, had responsibility for the direct oversight of the Department and any misconduct by the Chief of Police, Henderson.

15.    Plaintiff reported Henderson's conduct to Ashley Ramey ("Ramey"), Assistant City Manager, on August 27, 2009. The specific conduct that prompted Plaintiff to contact Ramey was related to Henderson's intrusion into her personal life, along with his harassment, daily acts of intimidation and outright threats against her job. Plaintiff specifically reported to Ramey that Henderson, without any official grounds and/or reasoning, had threatened her by telling her that her job may be in jeopardy if she continued a relationship with the individual she was then dating.

16.    Plaintiff further reported to Ramey in the August, 2009 meeting that she did not believe that her relationship with the individual that was the basis of Henderson's most recent target, in any way affected her ability to do her job. Further, Plaintiff's supervisor, Sgt. Eaton had expressed no concern regarding her personal life, and, in fact, had encouraged her to report Henderson's intrusion into Plaintiff's personal life.

17.    Plaintiff reported to Ramey that Henderson's intrusion into Plaintiff's personal life was unlike any interest he had shown in other officers. Plaintiff expressed her belief that she was being singled out and targeted. Plaintiff further informed Ramey that she was afraid to pursue a formal complaint against Henderson because she did not want to lose her job.

Ramey's response was to suggest that Plaintiff talk to Henderson directly with Sgt. Eaton present.

18.  When Plaintiff informed Sgt. Eaton of Ramey's response, he offered to speak to Henderson for Plaintiff regarding Henderson's misconduct because Plaintiff was fearful of the repercussions of confronting Henderson herself.

19.  Sgt. Eaton then met with Henderson regarding his inappropriate conduct and his targeting of me with demands and threats. After this meeting, Plaintiff was temporarily hopeful as Henderson's treatment of her seemed to improve for a brief period of time. Plaintiff was encouraged that she could possibly continue to work the job she loved without having to endure Henderson's hostility any longer. However, despite the fact that Henderson's behavior temporarily improved, it remained erratic at best regarding Plaintiff.

20.  In February 2010, Plaintiff spoke to Ramey again regarding Henderson's harassment of her and the hostile work environment she was forced to endure to keep her job and livelihood. Plaintiff reported to Ramey that Henderson's treatment of her was again "about the same" and that she was still suffering in a hostile work environment created as a direct result of Henderson's continued wrongful conduct consistent with the same concerns Plaintiff had originally reported in August, 2009.

21.  In the February, 2010 Plaintiff further shared with Ramey that Henderson's conduct toward her was so bad, that she had even considered going to the local high school as a SRO officer to escape his harassment. Plaintiff explained to Ramey that she had not requested the transfer solely because she was afraid Henderson would never allow her to be promoted if she did so.

22.  Plaintiff observed during the time between 2009 and 2011, that Henderson's treatment of her improved during those times that she was not dating anyone. Henderson's attacks of Plaintiff would subside during times that he learned she was not dating anyone, and Plaintiff would again be able to go to the job she loved for sporadic periods of peace.

23.   Plaintiff sought to appease Henderson no matter the costs to her emotional or physical wellbeing in order to maintain peace at work. Plaintiff's entire professional life was dependent upon her ability to appease Henderson and not to "cross him" no matter what as she had learned firsthand that the consequences would result in his constant abusive conduct and possibly her career.

24.   In an effort to stay on Henderson's good side, Plaintiff began working out with Henderson in spring of 2012 at a local gym frequented by local police officers. In fact, it was a private gym open only to employees of the Department. During such workouts, Henderson gave Plaintiff pointers on weight lifting as Plaintiff tried to stay in his good graces. By this time, Henderson's harassment and hostile conduct toward Plaintiff clearly implied that he could make her life and her job impossible if she did not do exactly as he wanted.

25.   During 2012, there were still several incidents that involved Henderson touching Plaintiff in ways that made her uncomfortable, both at the gym, as well as at the City's offices, but Plaintiff feared that if she crossed him or confronted him, she would suffer, at a minimum further harassment and the hostility he would reign down on her, and, at worst, the loss of her job and with it the stability that came with her chosen career, her livelihood and the future she had planned and worked for over her more than 20 year career.

26.   One example of Henderson's targeted harassment of Plaintiff occurred in 2012 at the Abbeville "Metro Office" where Plaintiff hand attended required "SRT" training. Henderson called Plaintiff from his vehicle while Plaintiff was sitting in her vehicle getting ready to leave the parking lot. Henderson asked Plaintiff if she wanted to go for a ride with him in his car. Plaintiff responded that it would not be a good idea. He demanded to know why. Plaintiff, in an effort to reject his offer without sparking his anger, explained to him that he was married and people would get the wrong idea. Plaintiff immediately drove away but was immediately fearful that she would again suffer at his hands for denying his request.

27.    Plaintiff suffered another such incident as she stood with Henderson beside his car casually talking as officers did on a regular basis at the Department offices.  Henderson leaned toward Plaintiff unexpectedly and kissed her.  Plaintiff again attempted to explain to Henderson why his actions were inappropriate while not sparking the hostility and targeted attacks she had learned were inevitable when she crossed him.  Plaintiff specifically explained that he could not do that and immediately got in her car and left the premises.

28.    After each of these incidents, just as Plaintiff feared, Henderson would get mad as a result of Plaintiff's refusal to "go along" with his advances, and Plaintiff would fear for her job and her future all over again.

29.    In late summer of 2012, Plaintiff began dating again.  Plaintiff received a text from Henderson asking specifically, "who is Bill Earl Priest Jr?"  His question immediately stood out to Plaintiff, because, while she had met and was dating a man named Bill Priest, she had not even learned his full name yet.   Plaintiff immediately realized that Henderson was watching her every move, even in her personal life and that he had obviously even investigated Mr. Priest solely because she was dating him.  Plaintiff immediately experienced the familiar terror of knowing Henderson's vicious conduct of threats, demands and intimidation was escalating to a new level of abuse.

30.    After learning that Plaintiff was dating someone, Henderson immediately started targeting her with harassing demands, threatening text messages, derogatory comments (many times in the presence of her fellow officers), and obvious hostility.  Several officers witnessed Henderson's conduct toward Plaintiff on a regular basis.

31.    During late summer and into the fall and winter of 2012, Henderson's conduct toward Plaintiff mimicked that of a roller coaster, as it spiraled and flailing out of control, running the gauntlet of emotion from outward hostility and vicious verbal attacks directed at Plaintiff, to sulking silence, and his refusal, at clearly calculated times, to answer direct questions

posed by Plaintiff in the course of her job performance, solely as a means of humiliating her in the presence of her fellow officers.

32.     Henderson directed inappropriate comments toward Plaintiff related to the "officers' moral code of conduct," insinuating that Plaintiff was, somehow, violating the morals expected of a police officer.   Henderson even asked Plaintiff on one occasion if I was "shacking up" and stated that he would not tolerate any of his officers shacking up.  However, Plaintiff was aware that he did not have that policy as to any other officer, nor had he ever even inquired or even voiced a concern regarding the living situation of any other officer that she was aware of in all of the years she had worked in the Department.

33.     On October 23, 2012, Plaintiff received a text from Henderson.  Plaintiff was off-duty and driving her personal vehicle on Highway 28 south at the time in Greenwood County.  Mr. Priest was in the passenger seat of Plaintiff's car with the seat reclined somewhat because he had a shoulder injury and wasn't feeling well.  In his text, Henderson wanted to know where Plaintiff was and "why one of [his] officers was hiding a person in their car."  While Plaintiff knew she was doing nothing wrong, she again knew that Henderson was stalking her every move and she was stricken with the same fear she had been force to endure at his hands for years.  When Plaintiff didn't immediately respond to the text, Henderson texted and asked if she was "...trying to come up with a good lie."  Henderson had again intruded into her personal life, subjected her to harassing demand and hostility, and forced her to live with the constant fear of the consequences he would reign down on her for daring to "cross him." Henderson's harassment now resulted from Plaintiff's basic attempts to live in peace without fear, if only while off duty.

34.     It was during this same time that Plaintiff requested a Department issued jacket, like that worn by detectives in the performance of their duties while not in uniform.  The particular jacket is worn by detectives and marked with "POLICE" on the back and the only Department designation.   Since Plaintiff had been filling in the detective position while one

of the detectives was out of work, she did not wear her uniform and requested the jacket as would be worn by anyone in that position. Henderson initially approved the request and Sgt. Eaton ordered it based upon the approval. However, by the time the jacket came in, Henderson was already waging another targeted attack on Plaintiff and determined to use even the mundane issuance of a Department issued article of uniform to send a message to Plaintiff that he could and would control her, both in her work life and in her personal life, even down to smallest detail.

35.     Sgt. Eaton called Plaintiff to pick up the coat and Plaintiff made a special trip to the Department to pick it up. However, because Plaintiff dared to arrive at the Department with Mr. Priest, as all officers did from time to time in bringing their girlfriends or wives with them when off–duty, Henderson immediately demanded that Plaintiff bring the jacket back. He had Sgt. Eaton text Plaintiff to bring the jacket back immediately.

36.     Despite Plaintiff's knowledge that she would suffer again Henderson's hostility and anger for no reason, and despite knowing that Henderson would continue to harass her, to single her out with his ever changing "policies" that applied only to her, to humiliate her in front of the other officers, to abuse her at every opportunity, all the while calculating new ways to control her through fear and intimidation, she immediately drove back to the Department to return the jacket in an effort to appease Henderson and keep the job she loved.

37.     When Plaintiff walked into the Department to hand the jacket to Henderson, he irrationally accused her of "betraying" him. Plaintiff was caught off guard but assured him that she did not know what he was talking about. Henderson's attack included obscenities and references to Plaintiff finding another job. Plaintiff was visibly shaken by the unexpected, undeserved and unfounded attack. When another officer expressed concern at the incident and questioned Henderson as to whether Plaintiff was okay, Henderson openly directed her to mind her own business.

38. Plaintiff continued to endure the onslaught of blatant hostility, harassment and discrimination directed at her by Henderson on a daily basis because she feared for her job and wanted desperately to keep the career she loved and had worked at for over twenty years.

39. However, the final straw came after Plaintiff's January 11, 2013 evaluation. Lt. Gray performed Plaintiff's evaluation as would be the normal course for annual evaluations. Plaintiff received a good evaluation just as she had received consistently for each and every year of her employment she began her career in 1993. After Plaintiff had already reviewed it and signed it, in the normal course, Lt. Gray called Plaintiff back to say that Henderson had added a comment in the supervisory section and demanded that she sign it again under his comment. Henderson had written on Plaintiff's evaluation "Employee will be loyal to the Abbeville Police Department and adhere "strictly" to the law enforcement code of ethics in professional and private life." Plaintiff questioned Lt. Gray if this had been included in his evaluation. He stated that it had not. Plaintiff refused to sign the evaluation.

40. Knowing Henderson's conduct would only get worse and worse and exhausting from fighting daily to maintain the job she loved in the face of Henderson's unbearable treatment for years, Plaintiff filed an official complaint against Henderson with the City, specifically, according to proper procedure, with McCuen's office, the same office that she had reported Henderson's misconduct to in 2009 and again in 2010. Henderson resigned rather than face a disciplinary investigation.

41. Plaintiff was put on administrative leave upon filing her complaint. Unfortunately, the Defendants' treatment of Plaintiff after she filed her complaint only compounded the damage she had already suffered as a direct result of Defendants' actions and/or failure to act for years.

42. After filing her complaint at the end of January and giving a written statement in February, 2013 detailing the misconduct she had endured, Plaintiff was forced to attend two (2) specially called City Hall meetings on Sunday and Monday, February 9th and 10th, 2013

without the benefit of an attorney. Plaintiff had previously asked if she could bring an attorney with her to the meetings, given that she had no idea what to expect at such a "hearing" before the City, but McCuen denied the request, instead instructing her that the City would not have its attorney at the meeting and she would not be allowed to have representation either.

43.    In these meetings, Plaintiff nervously recounted what she had endured, while being subjected to intimidating questioning as she sat alone to face the Defendants who had previously failed to stop Henderson's abuse of power.  In fact, Defendants had allowed Henderson to continue the previously reported misconduct that had clearly and obviously been targeted at Plaintiff, including sexual harassment, hostility, verbal abuse, humiliation, and manipulation through the use of threats and intimidation aimed at gaining control and domination of Plaintiff for his own personal gratification at costs of enormous damage to the Plaintiff, professionally, emotionally and even physically.

44.    Throughout the City's investigation of this matter, Plaintiff was forced to face the very entities and individuals responsible for failing to supervise Henderson throughout the time she suffered daily under his control of her.  Throughout these meetings, McCuen recorded Plaintiff's statements, but, as reflected in the transcribed records of each meeting, he pieced together strings of statements, and/or text messages, none of them in their entirety, without preserving an accurate record of Henderson's transgressions and Plaintiff's claims for any third party seeking a copy of the transcript in the future.

45.    Plaintiff was forced to face the Defendants alone and recount the horror of the previous four years.  Plaintiff attempted to recapture and put on the record an accurate account of four years of daily abuse, harassment and hostility in the brief time allowed by the City in its investigation of this matter, while answering the questions directed at her by McCuen as dictated by his agenda for the investigations.  However, Plaintiff was only able to summarize, by using specific examples that jumped to mind and text messages that served as evidence of

the same, the harassment that only scratched the surface of the day to day constant turmoil she endured for over four years working in the hostile environment created by Henderson's targeted schemes aimed solely at her.

46.    The Defendants, who were charged with investigating the misconduct Plaintiff was subjected to for years, not only had actual knowledge of Henderson's previously reported misconduct aimed at Plaintiff, but knew or should have known, based on the previously reported conduct, that Plaintiff would continue to suffer future harm caused by Henderson.

47.    Upon information and belief, Defendants knew or should have known that Plaintiff would continue to be subjected to Henderson's harassment, discrimination, threats, intimidation, and hostility unless they took action to protect her, to intervene and to mitigate future harm to her.

48.    Despite what Plaintiff had already endured, she continued to be harmed by Henderson's actions in humiliating her and undermining her regularly in front of fellow officers, and by the City's investigation of the matter after she filed her complaint.

49.    In September, 2013, the Department was restructured by the new chief of police. As a result of this restructuring, the position of Captain was terminated and two Patrol Lieutenants were put in place. The Department announced the openings and began accepting applications for the newly created positions. There was also an opening for Lieutenant of Investigations ("Detective"). Applications were accepted for this position as well. The two new Patrol Lieutenants and the Detective would all report directly to the chief.

50.    Plaintiff applied for the position of Patrol Lieutenant as well as the position of Detective and was granted an interview.

51.    There were three other applicants for the Patrol Lieutenant positions. Lt. Wilkie, a male officer, was the only other applicant for the Detective position. Plaintiff was interviewed on the same day as the three other applicants for the Patrol Lieutenant position.

52.    After the interviews, Plaintiff spoke to the other applicants about the context and subject matter of the interviews. It was clear that all applicants were asked the same series of

questions. It was also clear that there was a separate set of questions for the Patrol Lieutenant position than those asked in the interview for the Detective position.

53.    Despite being granted an interview for the Detective position, Plaintiff was never asked any of the questions related to the Detective position. She was denied even the opportunity for advancement, despite being qualified and having the necessary experience, by never even being interviewed in reality, despite an attempt to present a public intention to grant her the same opportunity for an interview as the other candidate.

54.    Plaintiff was more than qualified for both positions. She was the only applicant with a college degree. She had previous experience working the Detective position, filling in when the detective was out for sickness or vacation. Plaintiff was experienced with the paperwork required for this position and had extensive training that qualified her for all aspects of the position.

55.    Plaintiff was not promoted to any of the open positions. After the hiring process was concluded, Plaintiff was informed by the acting Chief that she was more than qualified for each of the positions, but did not "get the job" because she "lacked assertiveness." Prior to the actions that are the basis of Plaintiff's claims, she had always been considered assertive and considered to continuously move up the ladder within the Department. As a direct result of harm suffered by Plaintiff at the hands of the Defendant, upon information and belief, Plaintiff has also been denied any opportunity to progress in her career.

56.    Furthermore, upon information and belief, Plaintiff will never again be able to progress within the Department, and has now, and will in the future, be wrongfully discriminated against as a result of the claims that are the basis for this action, as well as, the fact that she is a female in a Department operated by males, supervised by males, and one in which no female thus far has been promoted over a male candidate, regardless of her qualifications for the position.

57. The Defendants have continued to subject Plaintiff to derogatory comments that serve to undermine her authority in front of fellow officers, continue to degrade Plaintiff within the Department, continue to discriminate against Plaintiff in daily activities, as well as, in denying her the opportunity to advance, all actions which result in Plaintiff being forced to continue to suffer under a hostile work environment for threat of losing her long worked for career and a stable future after more than 20 years of continuous service to the Department and the City.

58. Upon information and belief, Plaintiff alleges that the City, the Department, and McCuen had actual knowledge of Henderson engaging in inappropriate conduct directed at Plaintiff prior to Plaintiff filing a formal complaint.

59. Henderson's extreme and outrageous conduct and manipulative schemes to dominate and control Plaintiff for his personal gratification incorporated devices that served to instill fear in Plaintiff aimed at forcing Plaintiff to submit to his demands. Henderson threatened Plaintiff with the loss of her job, the loss of her career, the loss of her retirement and the stability it promised for her future, as well as the loss of her reputation among her fellow officers and the community in an effort to control her. This conduct constitutes conduct of an extreme and outrageous nature which intentionally and recklessly caused severe emotional distress to Plaintiff.

60. This extreme and outrageous conduct escalated to life threatening proportions on April 5, 2014. Plaintiff and fellow officer, Tanya Anderson, were on duty in Plaintiffs patrol car traveling on North Main Street, a roadway used frequently by Henderson, when a white vehicle swerved into Plaintiff's lane approaching the patrol car head on. Before there was impact, the white vehicle swerved back into the proper lane of travel, it was at this time Plaintiff was able to identify the driver of the vehicle, Henderson. Henderson was wearing glasses and a baseball cap; as the white vehicle continued travel in the opposite direction,

Plaintiff noticed the teacher plates on the vehicle, and knew them to be Henderson's. Plaintiff reported this incident to her supervisors.

61. Plaintiff has suffered severe emotional distress to the point that she has been forced to endure an extended medical leave as a result of a complete mental breakdown resulting from Defendants misconduct.

62. The City, the Department, and McCuen were negligent in the supervising and retaining Henderson, in spite of actual knowledge and numerous warnings that he was unfit to continue to serve as CEO of the Department as Chief of Police.

63. Defendants violated state and federal law, as well as the written policies of the Department as detailed in the Policies and Procedures Manual by their misconduct.

**FIRST CAUSE OF ACTION**
**(SEXUAL HARASSMENT)**

64. Paragraphs one through sixty-three, are incorporated by reference herein.

65. Plaintiff was constantly and continuously subjected to the unwanted advances, gender based comments, unwelcome touching, and gender based demands of her supervisor, Defendant Henderson. As Chief of Police, Henderson operated as the Chief Executive Officer of the Department under the supervision and control of the City, and specifically, McCuen.

66. Henderson directly threatened and implied through his targeted acts aimed at intimidating and humiliating Plaintiff, that if Plaintiff did not comply with his advances, or if she refused his demands, she would suffer the consequences, including threats of losing her job, threats of reporting her to SLED for imaginary and defamatory claims of wrongdoing, and threats of financial hardship based on lost wages and retirement.

67. Henderson's targeted gender based misconduct directed at Plaintiff continuously and constantly for years resulted in Plaintiff being forced to work in an environment so hostile that she could not perform her job without constant fear and anxiety.

## SECOND CAUSE OF ACTION
## (GENDER/SEXUAL DISCRIMINATION)

68. Paragraphs one through sixty-seven are hereby incorporated by reference as if fully set forth herein.

69. Plaintiff is a female patrol officer employed by the Department for over twenty years.

70. Plaintiff was consistently and constantly subjected to discrimination by the Defendants based on her gender. Such discriminatory acts included, being asked if she was "shacking up," being asked to sign Henderson's additional comment to her 2013 evaluation form whereby he demanded that she further expressly acknowledge her "moral obligations and duties" and her "loyalty to the Department" in stark contrast to the normal course of Department evaluations (no male officer was required to execute such an express affirmative acknowledgment as a part of their evaluation), and failing to provide her the substantive opportunity to actually interview for promotion.

71. Plaintiff has consistently performed her job at the highest level as evidenced by her annual evaluations. Plaintiff applied for and was denied three positions within the Department, all of which were promotions, and all of which she was more than qualified to hold, and, in fact, in many instances more highly qualified that the male applicants for the positions.

72. In the interview process for the position of Detective, upon information and belief, Plaintiff was granted an interview, but not presented with any of the questions presented to the only other candidate for the position, a male candidate. In fact, based upon information and belief, Plaintiff was not actually interviewed for the position but was only included in the process to maintain the appearance of a non-discriminatory fair hiring process.

73. The similarly situated male candidate for the position of Detective received favorable treatment in that he was the only one of the two candidates to be asked any interview questions related to the applied for position.

**THIRD CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

74. Paragraphs one through seventy-three are incorporated by reference as if fully set forth herein.

75. Defendants breached the City of Abbeville's Employee Policies and Procedures Manual for the Department, by failing to abide by specific provisions in the Manual. All Department employees are required to abide by the provisions of the manual as a condition to employment.

76. The Department maintains an express "Zero-Tolerance" policy towards any type of harassment based in race, color, religion, sex, sexual orientation, gender identity, age, national origin, disability or veteran status or any protected category under state, local, or federal law. The Defendants breached this provision by Henderson's constant, continuous and targeted and intentional sexual harassment of Plaintiff.

77. The Manual further state that does it does not tolerate certain unprofessional behavior, such as the use of offensive language. In fact unwelcome comments and inappropriate behavior by a supervisor constitutes harassment under the broad language contained in the Department's Zero-Tolerance policy towards any type of harassments based on the protected classes defined above. Henderson's references to Plaintiff "shacking up" and his unwanted advances, as well as his use of profanity and threats directed at Plaintiff violated the City's policies and procedures.

78. The Department's policy manual provides that qualified individuals will be given the opportunity to progress within the Department in accordance with their abilities and qualifications regardless of sex. Defendants breached this provision in failing to provide Plaintiff an opportunity to advance despite being qualified and, even more qualified in some instances than a male candidate.

**FOURTH CAUSE OF ACTION**
**(NEGLIGENCE)**

79. Defendants owed a duty of care to Plaintiff pursuant to her Employee relationship with Defendants, as clearly outlined in City's Code of Ordinances, Chapter 15, as well as, in the Department's Policy Manual.

80. Defendants breached that duty of care by subjecting Plaintiff to Henderson's continuous sexual harassment in violation of federal and state law, by systematically, continuously and intentionally violating their own policies in targeting and harassing her and forcing her to endure a hostile work environment, and by refusing to abide by written policies repeatedly over the course of her employment.

81. Defendants' breach of the duty of care owed to Plaintiff directly caused Plaintiff's damages, including, financial damages in lost wages due to the impact of Henderson's conduct on Plaintiff and from Plaintiff being denied promotions and the opportunity for advancement within the Department, and emotional pain and suffering as a direct result of the Defendants' actions.

**FOR A FIFTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress/Outrage)**

82. Paragraphs one through eighty-one are incorporated by reference as if fully set forth herein.

83. Defendant Henderson's actions on April 5, 2014, in which he exposed Plaintiff and fellow officer Tanya Anderson to a life threatening roadway collision, has caused Plaintiff sever emotional distress, as Plaintiff now fears each and every day physical harm at the hands of Henderson, which has manifested in the form of severe anxiety and depression.

84. Defendants' actions in subjecting Plaintiff to constant intentional and targeted sexual harassment so egregious that it rendered her workplace an environment so hostile that she could not perform her job without constant fear and anxiety in violation of state and federal law, Defendants' own written policies and in violation of public policy, in embarrassing her publically in the presence of co-workers and supervisors, and in forcing her to choose

between enduring humiliation, constant hostility, threats, demands, unwanted sexual advances, and intrusion into her personal life or losing her job, her career, her retirement and her stability were so outrageous and were done in reckless disregard for Plaintiff's emotional wellbeing.

85. Defendants' actions in forcing the Plaintiff to choose between enduring abusive hostile, threatening, and controlling behavior aimed at forcing her to submit to the unwanted control and the sexual demands of her Supervisor or enduring the loss of her twenty year career, her reputation, her retirement, and her future stability and the possibility of SLED investigation into falsified claims against her was so outrageous as to be readily understood to have been intentionally aimed at causing Plaintiff emotional distress.

86. Defendants' actions did cause Plaintiff severe emotional distress as is evidenced by the extended medical leave Plaintiff has been forced to endure as a result of her complete mental breakdown as a direct result of Defendants' conduct. Even after Plaintiff was forced to report the conduct, Defendants continued to inflict emotional distress after notice of the seriousness of her condition, by continuing to subject her to intimidation, harassment and humiliation.

87. Defendants' actions were such that they serve to outrage any person in a similar situation and the general population of this State.

**FOR A SIXTH CAUSE OF ACTION**
**(RETALIATION)**

88. Paragraphs one through eighty-seven are incorporated by reference as if fully set forth herein.

89. Plaintiff was forced to file a formal complaint against Defendants for sexual harassment and discrimination.

90. After filing the formal complaint, Plaintiff applied for four separate positions, all promotions and all positions for which she was more that qualified.

91. Since filing the formal complaint, Plaintiff has been denied the opportunity for advancement, being passed over for all four promotions for which she was qualified and, in most cases, more qualified that the other applicants.

92. Upon information and belief, Plaintiff has been repeatedly denied promotions as a result of her filing a formal complaint against the Defendants for sexual harassment and discrimination.

**FOR A SEVENTH CAUSE OF ACTION**
**(NEGLIGENT SUPERVISION, NEGLIGENT RETENTION, NEGLIGENT INFLICITON OF SEVERE EMOTIONAL DISTRESS)**

93. Paragraphs one through ninety-two are incorporated by reference as if fully set forth herein.

94. Defendant City, Defendant Department and Defendant McCuen (hereinafter the "Employing Defendants") were responsible for the oversight and supervision of Defendant Henderson. The Employing Defendants were negligent in that they breached duties in failing to supervising and in retaining Henderson after having actual knowledge of his misconduct in targeting Plaintiff for sexual harassment, his misconduct in sexually discriminating against Plaintiff by his previously reported actions targeted attacks against her, his humiliation of her in front of her fellow officers, and his threats and intimidation aimed and controlling her.

95. Further, the employing Defendants knew or should have known that it was likely that Plaintiff would suffer additional harm as a direct result of future misconduct by Henderson if she was forced to continue to endure the hostile work environment created by his constant and continued harassment of her.

96. The Employing Defendants failed to take adequate steps to ensure that Henderson did not cause future harm to Plaintiff by his misconduct.

97. Plaintiff did suffer harm, including infliction of severe emotional distress, as a result of the Employing Defendants' negligent supervision and retention of Henderson.

## FOR AN EIGHTH CAUSE OF ACTION (WANTON AND WILLFULL NEGLIGENCE)

98. Paragraphs one through ninety-seven are incorporated by reference as if fully set forth herein.

99. Defendants owed a duty to Plaintiff as a result of their relationship to Plaintiff as the Employing Defendants of Henderson.

100. Defendants willfully and wantonly breached their duty to Plaintiff by intentionally, willfully, and wantonly employing Henderson after having actual knowledge of Henderson's targeted sexual harassment of Plaintiff and after having actual knowledge that Plaintiff was being forced to endure a hostile work environment I violation of state and federal law.

101. Henderson owed a duty to Plaintiff as her supervisor and as CEO of the Department. He willfully and wantonly violated his duty to Plaintiff by his targeted sexual harassment of Plaintiff and by forcing Plaintiff to work in a hostile environment in violation of state and federal law.

102. The Defendants' willful and wanton breach of their respective duties directly caused Plaintiff to suffer damages, including emotional pain and suffering, and financial losses, including lost wages and future financial benefits.

**WHEREFORE,** Plaintiff prays for judgment against Defendants in the following particulars, to wit:

a. For actual, compensatory, and consequential damages;

b. For costs, attorney's fees, interest, and punitive damages as provided in the Act;

c. For such other and further relief as this Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all issues herein to which the right to a trial by jury is afforded.

Respectfully Submitted,
this 20th day of MAY, 2015.

Billy J. Garrett Jr.
109 Oak Avenue
Greenwood, S.C. 29646
Phone: (864) 229-8000
Fax: (864) 229-8001

Kimberly T. Thomason by Billy J. Garrett Jr. with her express permission

Kimberly T. Thomason,
SC Bar No. 79-179
TRULUCK THOMASON, LLC
110 Williams St.
Greenville, SC 29601
Telephone: (864) 331-1751
Facsimile: (864) 751-5818
Attorney for Plaintiff

STATE OF SOUTH CAROLINA

COUNTY OF ABBEVILLE

IN THE COURT OF COMMON PLEAS

ANGELA BURNS PRIEST

Plaintiff(s)

vs.

THE CITY OF ABBEVILLE, THE CITY OF ABBEVILLE POLICE DEPARTMENT, NEIL HENDERSON, IN HIS CAPACITY AS CHIEF OF POLICE AND DAVID MCCUEN, IN THIS CAPACITY AS CITY MANAGER

Defendant(s)

CIVIL ACTION COVERSHEET

2015-CP - 01 - 150

FILED
STATE OF SOUTH CAROLINA
COUNTY OF ABBEVILLE
2015 MAY 22 PM 1 21
EMILY Y MCMAHAN
CLERK OF COURT

Submitted By: BILLY J. GARRETT, JR.
Address: 109 OAK AVENUE, GREENWOOD, SC 29646

SC Bar #: 2353
Telephone #: 864-229-8000
Fax #: 864-229-8001
Other:
E-mail: billygarrettjr@yahoo.com

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint.

## DOCKETING INFORMATION (*Check all that apply*)

**If Action is Judgment/Settlement do not complete*

- [x] JURY TRIAL demanded in complaint.
- [ ] NON-JURY TRIAL demanded in complaint.
- [ ] This case is subject to ARBITRATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
- [ ] This case is subject to MEDIATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
- [ ] This case is exempt from ADR. (Proof of ADR/Exemption Attached)

## NATURE OF ACTION (*Check One Box Below*)

**Contracts**
- [ ] Constructions (100)
- [ ] Debt Collection (110)
- [ ] Employment (120)
- [ ] General (130)
- [ ] Breach of Contract (140)
- [ ] Other (199)

**Torts - Professional Malpractice**
- [ ] Dental Malpractice (200)
- [ ] Legal Malpractice (210)
- [ ] Medical Malpractice (220)

Previous Notice of Intent Case #
20____-NI-_____-________
- [ ] Notice/ File Med Mal (230)
- [ ] Other (299)

**Torts – Personal Injury**
- [ ] Assault/Slander/Libel (300)
- [ ] Conversion (310)
- [ ] Motor Vehicle Accident (320)
- [ ] Premises Liability (330)
- [ ] Products Liability (340)
- [ ] Personal Injury (350)
- [ ] Wrongful Death (360)
- [x] Other (399)

**Real Property**
- [ ] Claim & Delivery (400)
- [ ] Condemnation (410)
- [ ] Foreclosure (420)
- [ ] Mechanic's Lien (430)
- [ ] Partition (440)
- [ ] Possession (450)
- [ ] Building Code Violation (460)
- [ ] Other (499)

**Inmate Petitions**
- [ ] PCR (500)
- [ ] Mandamus (520)
- [ ] Habeas Corpus (530)
- [ ] Other (599)

**Administrative Law/Relief**
- [ ] Reinstate Drv. License (800)
- [ ] Judicial Review (810)
- [ ] Relief (820)
- [ ] Permanent Injunction (830)
- [ ] Forfeiture-Petition (840)
- [ ] Forfeiture—Consent Order (850)
- [ ] Other (899)

**Judgments/Settlements**
- [ ] Death Settlement (700)
- [ ] Foreign Judgment (710)
- [ ] Magistrate's Judgment (720)
- [ ] Minor Settlement (730)
- [ ] Transcript Judgment (740)
- [ ] Lis Pendens (750)
- [ ] Transfer of Structured Settlement Payment Rights Application (760)
- [ ] Confession of Judgment (770)
- [ ] Petition for Workers Compensation Settlement Approval (780)
- [ ] Other (799)

**Appeals**
- [ ] Arbitration (900)
- [ ] Magistrate-Civil (910)
- [ ] Magistrate-Criminal (920)
- [ ] Municipal (930)
- [ ] Probate Court (940)
- [ ] SCDOT (950)
- [ ] Worker's Comp (960)
- [ ] Zoning Board (970)
- [ ] Public Service Comm. (990)
- [ ] Employment Security Comm (991)
- [ ] Other (999)

**Special/Complex /Other**
- [ ] Environmental (600)
- [ ] Automobile Arb. (610)
- [ ] Medical (620)
- [ ] Other (699)
- [ ] Pharmaceuticals (630)
- [ ] Unfair Trade Practices (640)
- [ ] Out-of State Depositions (650)
- [ ] Motion to Quash Subpoena in an Out-of-County Action (660)
- [ ] Sexual Predator (510)

TRUE COPY
BY Emily Y. McMahan 5-22-15
ABBEVILLE COUNTY CLERK OF COURT

Submitting Party Signature: [signature] Date: May 22, 2015

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

**FOR MANDATED ADR COUNTIES ONLY**

Aiken, Allendale, Anderson, Bamberg, Barnwell, Beaufort, Berkeley, Calhoun, Charleston, Cherokee, Clarendon, Colleton, Darlington, Dorchester, Florence, Georgetown, Greenville, Hampton, Horry, Jasper, Kershaw, Lee, Lexington, Marion, Oconee, Orangeburg, Pickens, Richland, Spartanburg, Sumter, Union, Williamsburg, and York

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**You are required to take the following action(s):**

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs. (Medical malpractice mediation is mandatory statewide.)

4. Cases are exempt from ADR only upon the following grounds:

   a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

   b. Requests for temporary relief;

   c. Appeals

   d. Post Conviction relief matters;

   e. Contempt of Court proceedings;

   f. Forfeiture proceedings brought by governmental entities;

   g. Mortgage foreclosures; and

   h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:** **You must comply with the Supreme Court Rules regarding ADR. Failure to do so may affect your case or may result in sanctions.**

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF ABBEVILLE ) | EIGHTH JUDICIAL CIRCUIT |
| ANGELA BURNS PRIEST, Plaintiff, ) | **SUMMONS** |
| v. ) | C/A No. 2015-CP-01-150 |
| THE CITY OF ABBEVILLE, THE CITY OF ABBEVILLE POLICE DEPARTMENT, NEIL HENDERSON, IN HIS CAPACITY AS CHIEF OF POLICE AND DAVID MCCUEN, IN HIS CAPACITY AS CITY MANAGER ) | |
| Defendant. ) | (Jury Trial Demanded) |

**TO: THE DEFENDANT AND/OR THE DEFENDANT'S ATTORNEY:**

This **SUMMONS** requires you to answer the attached Complaint and to serve a copy of your Answer on the subscribers at their offices, **109 Oak Avenue, Greenwood, S.C. 29646 and 110 Williams Street, Greenville, S.C. 29601**, within **THIRTY (30) DAYS** after service thereof, exclusive of the day of such service, and if you fail to answer the said Complaint within that time, judgment by default will be rendered against you for the relief demanded in the Complaint.

**THE GARRETT LAW FIRM, P.C.**
Attorney for the Plaintiff

By: [signature]
Billy J. Garrett Jr.
109 Oak Avenue
Greenwood, S.C. 29646
Phone: (864) 229-8000
Fax: (864) 229-8001

FILED
STATE OF SOUTH CAROLINA
COUNTY OF ABBEVILLE
2015 MAY 22 PM 1 21
EMILY Y MCMAHAN
CLERK OF COURT

TRUE COPY
BY Emily Y. McMahan 5-22-15
ABBEVILLE COUNTY CLERK OF COURT

**TRULUCK THOMASON, LLC**
Attorney for the Plaintiff

By: ____________________
Kimberly T. Thomas
110 Williams Street
Greenville, S.C. 29601
Phone: (864) 331-1751
Fax: (864) 751-5818

Greenwood, South Carolina

May 20, 2015

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| COUNTY OF ABBEVILLE | ) | EIGHTH JUDICIAL CIRCUIT |
| ANGELA BURRIS PRIEST, | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| NEIL HENDERSON, | ) | C/A No. 2014-CP-01-244 |
| Defendant. | ) | (Jury Trial Demanded) |

FILED
STATE OF SOUTH CAROLINA
COUNTY OF ABBEVILLE
2014 SEP -2 AM 10: 10
EMILY Y MCMAHAN
CLERK OF COURT

The Plaintiff, while reserving motions filed and/or to be filed, would respectfully allege and show unto the Court as follows:

## JURISDICTION AND VENUE

1. The Plaintiff is a citizen and resident of Abbeville County, South Carolina.

2. Upon information and belief, the Defendant is a citizen and resident of Abbeville County, South Carolina.

3. This Court has personal jurisdiction over the parties and subject matter jurisdiction over the issues raised herein, and venue is proper in Abbeville County, South Carolina.

## FACTS

4. The Plaintiff has been employed by the Abbeville Police Department ("Department") for over twenty (20) years. Her employment began in 1993 when she volunteered as a reserve dispatcher. The Plaintiff was hired as a dispatcher and thereafter promoted to Abbeville City Clerk of Court. While performing clerk duties, the Plaintiff completed necessary training and became a certified Class III Officer.

5.      Since first being employed by the Department in 1993, the Plaintiff dreamed of attending the police academy. The Plaintiff accomplished that goal when she completed her training and graduated from the police academy in 2008. The Plaintiff currently holds the title of sergeant with the Department.

6.      The Plaintiff was subjected to inappropriate conduct by her supervisor, the Defendant, from the time he was named Chief of Police for the Department on March 9, 2004. However, the Defendant's conduct became increasingly worse and far more malicious toward the Plaintiff in 2009. During the next four (4) years, the Defendant harassed the Plaintiff, unfairly targeted her, treated her differently than other officers, intruded in her personal life, intimidated her, and caused her to live in constant fear for her job and her livelihood.

7.      Upon information and belief, the Defendant's actions escalated in intensity and destructiveness in 2009, because he was enraged that the Plaintiff began dating. For the previous years that the Defendant had been Department "CEO" and, as such, the Plaintiff's supervisor, the Plaintiff was married. However, in 2009, the Plaintiff was divorced. While the Plaintiff was married, the Defendant made inappropriate comments and demonstrated a "special interest" in her. However, after her divorce when the Plaintiff started dating, the Defendant began a targeted campaign to control the Plaintiff's personal life through harassment, threats, and intimidation.

8.      While the Plaintiff had been forced to endure harassment by the Defendant for years prior because she did not want to lose her job, when the Defendant's behavior became increasingly hostile, intrusive, and threatening, the Plaintiff had no choice but to report it.

9.      In early 2009, the Plaintiff was dating an individual who she learned had been involved in an incident with the Department. The incident was in no way connected to the Plaintiff;

she had no involvement in it; and the Plaintiff never discussed the incident with the individual she was dating or with anyone outside of the Department. The Plaintiff later learned that the matter was resolved and the case involving the individual she was dating was dismissed.

10.    Weeks later, the Defendant expressed to the Plaintiff that it was inappropriate for the Plaintiff to continue to see this individual. In fact, the Defendant sent the Plaintiff a text message stating that he knew she was dating this individual and threatening the Plaintiff that he was going to "get SLED involved and have Plaintiff charged with misconduct in office." The Plaintiff did not understand why the Defendant would threaten her with a SLED investigation as she had never been involved in any conduct or any relationship that negatively impacted her ability to perform her job at the highest level of excellence or that violated her duties and obligations to the Department. The Plaintiff continued to stress to the Defendant that she did not understand why he was he was threatening her in text messages containing threats and demands when she had not done anything that violated her duties as an employee of the Department. The Plaintiff reasonably concluded that the Defendant was using the threat of a SLED investigation to scare her, to intimidate her, and to force her to submit to his control of her personal life. The Defendant also told the Plaintiff's immediate supervisor, Mike Eaton, to talk to the Plaintiff about dating this individual and the consequences of a SLED investigation. The Defendant also called the Plaintiff into his office to discuss a potential SLED investigation, which had the effect of scaring the Plaintiff.

11.    The Plaintiff reported to Abbeville Assistant City Manager Ashley Ramey ("Ramey") that the Defendant's intrusion into the Plaintiff's personal life was unlike any interest he had shown in other officers. The Plaintiff expressed her belief that she was being singled out and targeted. The Plaintiff further informed Ramey that she was afraid to pursue a formal complaint against the

Defendant because she did not want to lose her job. Ramey's response was to suggest that the Plaintiff talk to the Defendant directly with Sgt. Mike Eaton ("Eaton") (the Plaintiff's supervisor at the time) present.

12.    When the Plaintiff informed Eaton of Ramey's response, he offered to speak to the Defendant for the Plaintiff regarding the Defendant's misconduct because the Plaintiff was fearful of the repercussions of confronting the Defendant herself.

13.    Eaton then met with the Defendant regarding his inappropriate conduct and his targeting of the Plaintiff with demands and threats. After this meeting, the Plaintiff was temporarily hopeful as the Defendant's treatment of her seemed to improve for a brief period of time. The Plaintiff was encouraged that she could possibly continue to work the job she loved without having to endure the Defendant's hostility any longer. However, despite the fact that the Defendant's behavior temporarily improved, it remained erratic at best regarding the Plaintiff.

14.    The Plaintiff observed during the time between 2009 and 2011 that the Defendant's treatment of her improved during those times that she was not dating anyone. The Defendant's attacks against the Plaintiff would subside during times that he learned she was not dating anyone, and the Plaintiff would again be able to go to the job she loved for sporadic periods of peace.

15.    The Plaintiff sought to appease the Defendant no matter the costs to her emotional or physical well-being in order to maintain peace at work. The Plaintiff's entire professional life was dependent upon her ability to appease the Defendant and not to "cross him" no matter what as she had learned firsthand that the consequences would result in his constant abusive conduct and possibly her career.

16. The Plaintiff began working out in spring 2012 at a local gym frequented by local police officers. In fact, it was a private gym open only to employees of the Department. During such workouts, the Defendant gave the Plaintiff pointers on weight lifting as the Plaintiff tried to stay in his good graces.

17. During 2012, there were still several incidents that involved the Defendant touching the Plaintiff in ways that made her uncomfortable, both at the gym as well as at the Department's offices, but the Plaintiff feared that if she crossed him or confronted him, she would suffer, at a minimum, further harassment and the hostility he would reign down on her, and, at worst, the loss of her job and with it the stability that came with her chosen career, her livelihood, and the future she had planned and worked for over her more than twenty (20) year career. The Defendant kissed the Plaintiff unexpectedly at the gym, fondled her inappropriately numerous times, and lifted her clothing to look at her body. The Defendant would get angry if the Plaintiff didn't go to the gym and if she didn't perform certain exercises at the gym.

18. Another example of the Defendant's targeted assault of the Plaintiff occurred in July-September 2012 at the Abbeville "Metro Office" where the Plaintiff attended required "SRT" training and after everyone else had left. The Defendant called the Plaintiff from his vehicle while the Plaintiff was sitting in her vehicle getting ready to leave the parking lot. The Defendant told the Plaintiff to get out of her car and talk to him, which she did. The Defendant asked the Plaintiff if she wanted to go for a ride with him in his car. The Plaintiff responded that it would not be a good idea. He demanded to know why. The Plaintiff, in an effort to reject his offer without sparking his anger, explained to him that he was married and people would get the wrong idea. The Defendant leaned toward the Plaintiff unexpectedly and kissed her. The Plaintiff again attempted to explain

to the Defendant why his actions were inappropriate while not sparking the hostility and targeted attacks she had learned were inevitable when she crossed him. The Plaintiff immediately drove away but was immediately fearful that she would again suffer at the Defendant's hands for denying his request.    19.    After each of these incidents, just as the Plaintiff feared, the Defendant would get mad as a result of the Plaintiff's refusal to "go along" with his advances, and the Plaintiff would fear for her job and her future all over again.

20.    In late summer 2012, the Plaintiff began dating again. The Plaintiff received a text from the Defendant asking specifically, "...who is Bill Earl Priest Jr?" His question immediately stood out to the Plaintiff, because, while she had met and was dating a man named Bill Priest, she had not even learned his full name yet. The Plaintiff immediately realized that the Defendant was watching her every move, even in her personal life, and that he had obviously even investigated Mr. Priest solely because she was dating him. The Plaintiff immediately experienced the familiar terror of knowing the Defendant's vicious conduct of threats, demands, and intimidation was escalating to a new level of abuse.

21.    After learning that Plaintiff was dating someone, the Defendant immediately started targeting her with threatening text messages, derogatory comments (many times in the presence of her fellow officers), and obvious hostility. Several officers witnessed the Defendant's conduct toward the Plaintiff on a regular basis.

22.    During late summer and into the fall and winter of 2012, the Defendant's conduct toward the Plaintiff mimicked that of a roller coaster, as it spiraled and flailed out of control, running the gauntlet of emotion from outward hostility and vicious verbal attacks directed at the Plaintiff, to sulking silence, and his refusal, at clearly calculated times, to answer direct questions posed by

the Plaintiff in the course of her job performance, solely as a means of humiliating her in the presence of her fellow officers.

23.    The Defendant directed inappropriate comments toward the Plaintiff related to the "officers' moral code of conduct," insinuating that the Plaintiff was, somehow, violating the morals expected of a police officer. The Defendant even asked the Plaintiff on one (1) occasion if she was "shacking up" and stated that he would not tolerate any of his officers shacking up. However, the Plaintiff was aware that the Defendant did not have that policy as to any other officer, nor had he ever even inquired or even voiced a concern regarding the living situation of any other officer that she was aware of in all of the years she had worked in the Department.

24.    On October 23, 2012, the Plaintiff received a text from the Defendant. The Plaintiff was off-duty and driving her personal vehicle on Highway 28 South at the time in Abbeville County. Mr. Priest was in the passenger seat of the Plaintiff's car with the seat reclined somewhat because he had a shoulder injury and wasn't feeling well. In his text, the Defendant wanted to know where the Plaintiff was and "why one of [his] officers was hiding a person in their car." While the Plaintiff knew she was doing nothing wrong, she again knew that the Defendant was stalking her every move and she was stricken with the same fear she had been forced to endure at his hands for years. When the Plaintiff didn't immediately respond to the text, the Defendant texted and asked if she was "...trying to come up with a good lie." The Defendant had again intruded into the Plaintiff's personal life, subjected her to harassing demand and hostility, and forced her to live with the constant fear of the consequences he would reign down on her for daring to "cross him." The Defendant's harassment now resulted from the Plaintiff's basic attempts to live in peace without fear, if only while off duty.

25.    The Plaintiff knew that she would suffer the Defendant's hostility and anger for no reason, and knew that the Defendant would continue to harass her, to single her out with his ever changing "policies" that applied only to her, to humiliate her in front of the other officers, and to abuse her at every opportunity, all the while calculating new ways to control her through fear and intimidation.

26.    When the Plaintiff walked into the Department to return an article of police clothing that had been issued to her, the Defendant irrationally accused her of "betraying" him. The Plaintiff had been issued a jacket by the Defendant, but he got mad and made the Plaintiff return the jacket. The Plaintiff was caught off guard but assured the Defendant that she did not know what he was talking about. The Defendant's attack included obscenities and references to the Plaintiff finding another job. The Plaintiff was visibly shaken by the unexpected, undeserved, and unfounded attack. When another employee expressed concern at the incident and questioned the Defendant as to whether the Plaintiff was OK, the Defendant openly directed the other employee to mind her own business.

27.    The Plaintiff continued to endure the onslaught of blatant hostility directed at her by the Defendant on a daily basis because she feared for her job and wanted desperately to keep the career she loved and had worked at for over twenty (20) years.

28.    Knowing the Defendant's conduct would only get worse and worse and exhausted from fighting daily to maintain the job she loved in the face of the Defendant's unbearable treatment for years, and after being threatened with another SLED investigation, the Plaintiff filed an official complaint against the Defendant with the City of Abbeville, specifically, according to proper procedure, with the same office that she had reported the Defendant's misconduct to in 2009 and

again in 2010. The Defendant resigned rather than face a disciplinary investigation.

29. The Plaintiff was put on administrative leave upon filing her complaint. Unfortunately, the Defendant's treatment of the Plaintiff after she filed her complaint only compounded the damage she had already suffered as a direct result of the Defendant's actions for years.

30. The Defendant's extreme and outrageous conduct and manipulative schemes to dominate and control the Plaintiff for his personal gratification incorporated devices that served to instill fear in the Plaintiff aimed at forcing the Plaintiff to submit to his demands. The Defendant threatened the Plaintiff with the loss of her job, the loss of her career, the loss of her retirement, and the stability it promised for her future, as well as the loss of her reputation among her fellow officers and the community in an effort to control her. This conduct, along with physical assault and battery and unlawful touching, constitutes conduct of an extreme and outrageous nature which intentionally and recklessly caused severe emotional distress to the Plaintiff.

31. The Plaintiff has suffered severe emotional distress to the point that she has been forced to endure an extended medical leave as a result of a complete mental breakdown resulting from the Defendant's misconduct.

**FIRST CAUSE OF ACTION**

**(ASSAULT AND BATTERY)**

32. Paragraphs One through Thirty-One are incorporated by reference herein.

33. The Plaintiff was constantly and continuously subjected to the unwanted advances, unwelcome touching, and abusive demands of her supervisor, the Defendant.

34. The Defendant directly threatened and implied, through his targeted acts aimed at

intimidating and humiliating the Plaintiff, that if the Plaintiff did not comply with his advances, or if she refused his demands, she would suffer the consequences, including threats of losing her job, threats of reporting her to SLED for imaginary and defamatory claims of wrongdoing, and threats of financial hardship based on lost wages and retirement.

35. The Defendant touched, threatened to touch, assaulted, and battered the Plaintiff throughout this matter and into and through the month of February 2013.

36. The Defendant, even after leaving the Department, attempted to hit, slam into, intimidated, and caused an accident by vehicle, when he assaulted the Plaintiff by almost hitting her police vehicle while she was training Tonya Anderson in April 2014. The Plaintiff and her trainee were turning left onto South Main headed north when a car driven by the Defendant headed south veered over into the Plaintiff's lane of traffic, and the Defendant then jerked his vehicle back into his lane of traffic only a couple of car lengths from the Plaintiff's vehicle. This incident caused the Plaintiff extreme emotional distress.

**SECOND CAUSE OF ACTION**

**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/OUTRAGE)**

37. Paragraphs One through Thirty-Six are incorporated by reference as if fully set forth herein.

38. The Defendant's actions in subjecting the Plaintiff to constant intentional and targeted assault and battery so egregious that it rendered her life so hostile that she could not perform her job without constant fear and anxiety, in embarrassing her publically in the presence of co-workers and supervisors, and in forcing her to choose between enduring humiliation, constant hostility, threats, demands, unwanted personal advances, and intrusion into her personal life or losing her job, her

career, her retirement, and her stability were so outrageous and were done in reckless disregard for the Plaintiff's emotional well-being.

39.     The Defendant's actions in forcing the Plaintiff to choose between enduring abusive, hostile, threatening, and controlling behavior aimed at forcing her to submit to the unwanted control and the sexual demands of her supervisor or enduring the loss of her twenty (20) year career, her reputation, her retirement, and her future stability and the possibility of SLED investigation into falsified claims against her was so outrageous as to be readily understood to have been intentionally aimed at causing the Plaintiff emotional distress.

40.     The Defendant's actions did cause the Plaintiff severe emotional distress as is evidenced by the extended medical leave the Plaintiff has been forced to endure as a result of her complete mental breakdown as a direct result of the Defendant's conduct.  Even after the Plaintiff was forced to report the conduct, the Defendant continued to inflict emotional distress after notice of the seriousness of her condition, by continuing to subject her to intimidation, harassment, and humiliation, with the most recent event being the accident scare and intimidation.

41.     The Defendant's actions were such that they serve to outrage any person in a similar situation and the general population of this State.

**WHEREFORE, the Plaintiff prays for judgment against the Defendant in the following particulars, to wit:**

a.     For actual, compensatory, consequential, and punitive damages for each cause of action;

b.     For costs and attorney fees; and

c.     For such other and further relief as this Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

**The Plaintiff hereby demands a trial by jury as to all issues herein to which the right to a trial by jury is afforded.**

**THE GARRETT LAW FIRM, P.C.**
Attorney for the Plaintiff

By: ______________________
Billy J. Garrett Jr.
109 Oak Avenue
Greenwood, S.C. 29646
Phone: (864) 229-8000
Fax: (864) 229-8001

**TRULUCK THOMASON, LLC**
Attorney for the Plaintiff

By: Kimberly Thomason
Kimberly T. Thomason
By Billy Garrett with her express permission!
110 Williams Street
Greenville, S.C. 29601
Phone: (864) 331-1751
Fax: (864) 672-4007

Greenwood, South Carolina

August 29, 2014

**TRULUCK THOMASON, LLC**
Attorney for the Plaintiff

By: Kimberly Thomason by Bill Garrett with her express permission
Kimberly T. Thomason
110 Williams Street
Greenville, S.C. 29601
Phone: (864) 331-1751
Fax: (864) 672-4007

Greenwood, South Carolina

August 29, 2014

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF ABBEVILLE | ) | EIGHTH JUDICIAL CIRCUIT |
| ANGELA BURRIS PRIEST, | ) | |
| Plaintiff, | ) | |
| v. | ) | **SUMMONS** |
| NEIL HENDERSON, | ) | C/A No. 2014-CP-01-244 |
| Defendant. | ) | (Jury Trial Demanded) |

FILED
STATE OF SOUTH CAROLINA
COUNTY OF ABBEVILLE
2014 SEP -2 AM 10: 10
EMILY Y MCMAHAN
CLERK OF COURT

**TO: THE DEFENDANT AND/OR THE DEFENDANT'S ATTORNEY:**

This **SUMMONS** requires you to answer the attached Complaint and to serve a copy of your Answer on the subscribers at their offices, **109 Oak Avenue, Greenwood, S.C. 29646 and 110 Williams Street, Greenville, S.C. 29601,** within **THIRTY(30) DAYS** after service thereof, exclusive of the day of such service, and if you fail to answer the said Complaint within that time, judgment by default will be rendered against you for the relief demanded in the Complaint.

**THE GARRETT LAW FIRM, P.C.**
Attorney for the Plaintiff

By: [signature]
Billy J. Garrett Jr.
109 Oak Avenue
Greenwood, S.C. 29646
Phone: (864) 229-8000
Fax: (864) 229-8001

**FC MANDATED ADR COUNTIES ON**

Aiken, Allendale, Anderson, Bamberg, Barnwell, Beaufort, Berkeley, Calhoun, Charleston, Cherokee, Clarendon, Colleton, Darlington, Dorchester, Florence, Georgetown, Greenville, Hampton, Horry, Jasper, Kershaw, Lee, Lexington, Marion, Oconee, Orangeburg, Pickens, Richland, Spartanburg, Sumter, Union, Williamsburg, and York

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**You are required to take the following action(s):**

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs. (Medical malpractice mediation is mandatory statewide.)

4. Cases are exempt from ADR only upon the following grounds:

   a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

   b. Requests for temporary relief;

   c. Appeals

   d. Post Conviction relief matters;

   e. Contempt of Court proceedings;

   f. Forfeiture proceedings brought by governmental entities;

   g. Mortgage foreclosures; and

   h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:** **You must comply with the Supreme Court Rules regarding ADR. Failure to do so may affect your case or may result in sanctions.**

STATE OF SOUTH CAROLINA )
COUNTY OF ABBEVILLE ) IN THE COURT OF COMMON PLEAS

ANGELA BURRIS PRIEST,
Plaintiff(s)

vs.

NEIL HENDERSON,
Defendant(s)

CIVIL ACTION COVERSHEET

2014-CP - 01- 344

Submitted By: BILLY J. GARRETT, JR.
Address: 109 OAK AVENUE, GREENWOOD, S.C. 29646

SC Bar #:
Telephone #: 864-229-8000
Fax #: 864-229-8001
Other:
E-mail:

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint.

**DOCKETING INFORMATION** *(Check all that apply)*

***If Action is Judgment/Settlement do not complete**

☒ JURY TRIAL demanded in complaint. ☐ NON-JURY TRIAL demanded in complaint.
☐ This case is subject to ARBITRATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is subject to MEDIATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

**NATURE OF ACTION** *(Check One Box Below)*

**Contracts**
- ☐ Constructions (100)
- ☐ Debt Collection (110)
- ☐ Employment (120)
- ☐ General (130)
- ☐ Breach of Contract (140)
- ☐ Other (199)

**Torts - Professional Malpractice**
- ☐ Dental Malpractice (200)
- ☐ Legal Malpractice (210)
- ☐ Medical Malpractice (220)

Previous Notice of Intent Case #
20___-CP-___-______
- ☐ Notice/ File Med Mal (230)
- ☐ Other (299)

**Torts – Personal Injury**
- ☒ Assault/Slander/Libel (300)
- ☐ Conversion (310)
- ☐ Motor Vehicle Accident (320)
- ☐ Premises Liability (330)
- ☐ Products Liability (340)
- ☐ Personal Injury (350)
- ☐ Wrongful Death (360)
- ☐ Other (399)

**Real Property**
- ☐ Claim & Delivery (400)
- ☐ Condemnation (410)
- ☐ Foreclosure (420)
- ☐ Mechanic's Lien (430)
- ☐ Partition (440)
- ☐ Possession (450)
- ☐ Building Code Violation (460)
- ☐ Other (499)

**Inmate Petitions**
- ☐ PCR (500)
- ☐ Mandamus (520)
- ☐ Habeas Corpus (530)
- ☐ Other (599)

**Administrative Law/Relief**
- ☐ Reinstate Drv. License (800)
- ☐ Judicial Review (810)
- ☐ Relief (820)
- ☐ Permanent Injunction (830)
- ☐ Forfeiture-Petition (840)
- ☐ Forfeiture—Consent Order (850)
- ☐ Other (899)

**Judgments/Settlements**
- ☐ Death Settlement (700)
- ☐ Foreign Judgment (710)
- ☐ Magistrate's Judgment (720)
- ☐ Minor Settlement (730)
- ☐ Transcript Judgment (740)
- ☒ Lis Pendens (750)
- ☐ Transfer of Structured Settlement Payment Rights Application (760)
- ☐ Confession of Judgment (770)
- ☐ Petition for Workers Compensation Settlement Approval (780)
- ☐ Other (799)

**Appeals**
- ☐ Arbitration (900)
- ☐ Magistrate-Civil (910)
- ☐ Magistrate-Criminal (920)
- ☐ Municipal (930)
- ☐ Probate Court (940)
- ☐ SCDOT (950)
- ☐ Worker's Comp (960)
- ☐ Zoning Board (970)
- ☐ Public Service Comm. (990)
- ☐ Employment Security Comm (991)
- ☐ Other (999)

**Special/Complex /Other**
- ☐ Environmental (600)
- ☐ Automobile Arb. (610)
- ☐ Medical (620)
- ☐ Other (699)
- ☐ Pharmaceuticals (630)
- ☐ Unfair Trade Practices (640)
- ☐ Out-of State Depositions (650)
- ☐ Motion to Quash Subpoena in an Out-of-County Action (660)
- ☐ Sexual Predator (510)

**Submitting Party Signature:** [signature] #2353 **Date:** AUGUST 29, 2014

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.